### DUNLEVIE v. SPANGENBERG et al.

(Supreme Court, Special Term, Erie County. February 14, 1910.)

1. JUDGMENT (§ 829*)—CONCLUSIVENESS—JUDGMENT OF FEDERAL COURT—EFFECT IN STATE COURT.

An action in the federal Circuit Court resulting in a judgment of dismissal for failure to establish a cause of action, followed by a judgment of the Circuit Court of Appeals, on appeal, dismissing, on its own motion, the action because the federal courts were without jurisdiction, does not bar a subsequent action in the state courts on the same cause of action.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1511–1513; Dec. Dig. § 829.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CONTRACTS (§ 245*)—WRITTEN CONTRACTS—MERGER OF PRIOR ORAL NEGOTIA-
TIONS. o

The court, in determining whether correspondence between parties created a valid contract between them, will treat all prior parol agreements as merged in the writing.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1129; Dec. Dig. § 245.*]

3. LOGS AND LOGGING (§ 34*)—CONTRACTS BY CORRESPONDENCE.

A letter by a seller offered to sell logs stocked at a river and those which he might bring to the river the coming winter at a specified price. The buyer replied by accepting the proposition, and stating that he understood that the seller was selling about 5,000,000 feet, that the terms were cash and the logs were to be scaled. The seller replied that his proposition did not specify any amount of logs but only such as he found it expedient to bring to the river. The buyer replied by explaining why he had fixed the amount, and the seller subsequently wrote advising the buyer that there were about 700,000 cut and skidded along the river. The buyer replied that he would arrange with the seller as to his arrival for the scaling of the logs, etc. The seller thereafter rendered a bill for logs sold, and further stated that he would have about 150,000 additional logs for delivery in the future. *Held* to establish a contract of sale.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. § 104; Dec. Dig. § 34.*]

4. SALES (§ 32*)—CONTRACTS BY CORRESPONDENCE.

In determining whether a contract of sale has been established by correspondence between the parties, the court must consider the entire correspondence.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 59; Dec. Dig. § 32.*]

5. LOGS AND LOGGING (§ 34*)—CONTRACTS—VALIDITY—CERTAINTY AS TO SUB-
JECT-MATTER.

The existence of two different rules for measuring logs does not vitiate a contract for the sale of logs which provides for ascertaining the quantity by scaling logs but which is silent as to what scale shall be adopted, but the court will presume that the quantity is to be ascertained by the rule in common use where the logs were sold and the scaling done.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. § 104; Dec. Dig. § 34.*]

6. SALES (§ 55*)—CONTRACTS—STANDARD OF MEASURE—WHAT LAW GOVERNS.

In the absence of any agreed standard of measure in a contract of sale, that of the place where the commodity is purchased governs.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 153; Dec. Dig. § 55.*]

7. LOGS AND LOGGING (§ 34*)—SALE OF LOGS—VALIDITY.

Where a seller of logs offered to sell the logs stocked at a river and to sell those which he would bring to the river during the winter and the buyer accepted the offer, the contract was merely an agreement to sell logs when cut, and the contract, though governed by the laws of Pennsylvania, was not in violation of Laws Pa. 1895 (P. L. 113), relating to the sale of land or timber.

[Ed. Note.—For other cases, see Logs and Logging, Cent. Dig. § 104; Dec. Dig. § 34.*]

8. TENDER (§ 5*)—WAIVER.

A tender of payment is waived by the refusal of the creditor to receive less than an amount in excess of that to which he is entitled, and the creditor is estopped from taking advantage of a failure to tender the proper amount.

[Ed. Note.—For other cases, see Tender, Cent. Dig. §§ 6, 7; Dec. Dig. § 5.*]

9. SALES (§ 101*)—RESCISSION—ESTOPPEL—TENDER OF PAYMENT—WAIVER.

Where a seller demanded payment of a sum in excess of the amount he was entitled to receive, and gave notice that unless payment was made at the excessive figure he would cancel the contract, the buyer need not tender

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

payment of the amount actually due and the seller was estopped from rescinding the contract because of a failure to tender the proper amount.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 267, 268; Dec. Dig. § 101.*]

10. CONTRACTS (§ 179*)—PERSONAL LIABILITY OF TRUSTEE.

The mere use of the name "trustee" will not discharge the trustee from personal liability, but the word will be deemed simply a description of the person and the trustee will be held personally liable.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 777, 778; Dec. Dig. § 179.*]

11. TRUSTS (§ 210*)—PERSONAL LIABILITY OF TRUSTEE.

A trustee cannot charge the trust estate by his executory contracts unless authorized so to do by the instrument creating the trust, and, on such contracts, he is personally liable.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 300; Dec. Dig. § 210.*]

12. TRUSTS (§ 210*)—PERSONAL LIABILITY OF TRUSTEE.

Some of the creditors of an absconding debtor agreed that two persons should take charge of the debtor's property and business, and continue the business, and realize on his assets and satisfy the claims of the creditors therefrom, as far as possible. Neither the debtor nor any court ever authorized the two persons to continue the business. The persons made executory contracts while continuing the business. *Held*, that they were personally liable thereon.

[Ed. Note.—For other cases, see Trusts, Cent. Dig. § 300; Dec. Dig. § 210.*]

13. SALES (§ 418*)—BREACH OF CONTRACT—MEASURE OF DAMAGES.

Where a seller of logs refused to deliver, the buyer could recover the difference between the contract price and the value of the logs at the place of delivery.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 1195; Dec. Dig. § 418.*]

Action by Ernest V. Dunlevie against Justin W. Spangenberg and another. Judgment for plaintiff.

James McCormick Mitchell, for plaintiff.

Adelbert Moot and Allen J. Hastings, for defendant John R. Droney.

WHEELER, J. This action is instituted to recover damages for the breach of an alleged contract for the sale of certain logs. The contract was made at or near Cameron in the state of Pennsylvania, and related to logs then lying on the banks of the Sinnemahoning river.

The essential facts are undisputed. One W. R. Johnson had been operating in the lumbering business at the place designated. He had the right, by virtue of a certain lease which expired in 1903, to cut and remove from a tract of land the standing timber. He had cut a portion of this timber, and the logs so cut had been hauled, and lay at the river at the time the contract in question was made. The other timber remained to be cut. Johnson became financially involved and absconded. He left behind a large number of creditors. He has not since been heard from. The defendants, or the concerns in which they were financially interested, were large creditors of Johnson. On or about May 1, 1902, the J. R. Droney Lumber Company, of which

the defendant Droney was the president, the Warren-Packard Company, of which the defendant Spangenberg was secretary and treasurer, Wilson Bros., and the E. V. Babcock Company, entered into an agreement for the purpose of avoiding litigation among themselves regarding the priority of their respective liens on the Johnson property, which contract provided, in substance, that the defendants should take charge of Johnson's property and affairs, and continue the operation of his business, and realize on his assets, and satisfy, as far as possible, the claims of said creditors therefrom. In accordance with this arrangement, the defendants did take charge of Johnson's property and affairs, and proceeded to realize on his assets. They sent a communication to all parties appearing as creditors upon Johnson's books, requesting their consent that they, the defendants, should act as trustees in the interest of creditors, and, in response to such circular communication, informal consents were received from a majority of the creditors that the defendants should act in the capacity suggested. The plaintiff, Ernest V. Dunlevie, had no knowledge of this agreement, and no knowledge of the alleged trusteeship further than that they added the word "trustees" to their signatures to the letters which they wrote the plaintiff. The defendants were not elected or appointed trustees of the Johnson property in any legal proceedings, and many of the consents of creditors of Johnson to the arrangement proposed to them were, in fact, given after the defendants had opened negotiations with the plaintiff for the sale of the timber in dispute. After having taken possession of the Johnson property, including the logs and timber lands in question, the defendants met the plaintiff, and negotiations were opened with him for the sale of the logs at the river, and the timber to be cut. The preliminary negotiations resulted in the correspondence between them which followed, and which constitutes the contract between the parties, if one was made. This correspondence opened with a letter addressed to the plaintiff, dated May 7th, 1902. The following is the correspondence which followed:

"Office of W. D. Johnson,
Manufacturer and Wholesale Dealer in Hemlock and Hardwood Lumber and Shingles—General Merchandise.

"Direct all correspondence to
"Emporium, Pa., May 7, 1902.

"E. V. Dunlevie, Esq., Buffalo, N. Y.—Dear Sir: We will sell you the logs which we have stocked to the Sinnemahoning river for six dollars per M., where they now lie, and will also sell you those which we bring to the river the coming winter at same price. Terms cash when scaled.

"Respectfully, J. W. Spangenberg,
"J. R. Droney, Trustees.
"Estimated amount of timber about five million feet. J. R. Droney."

"E. V. Dunlevie, Manufacturer & Wholesaler. Hemlock and Hardwood Lumber, Lath and Shingles.

"Mills and Yards, Ellisburg, Pa.

"Prudential Bldg., Buffalo, N. Y., 5, 10, '02.

"Mr. J. W. Spangenberg, Trustee, Emporium, Pa.—Dear Sir: I beg to acknowledge receipt of letter dated March 7th signed by yourself and Mr. Droney, as trustees of Mr. W. B. Johnson & Co., which letter confirms the conversation I had with Mr. Droney, in reference to the matter stated therein, and I herewith advise you that I accept your proposition for the purchase of the logs in question. My understanding of the matter being, that you sell me

about five million (5,000,000) feet of hemlock, pine and oak logs. That you are to stock the same on the banks of the Sinnemahoning river. The logs that are already skidded to the river I am to take where they lay, but all of the logs covered by this contract are to be stocked as above, between this date and the spring of 1903. Terms are to be cash when the logs are scaled, and the logs are to be scaled when they are stocked to the river as above. The logs are to be scaled by two competent log scalers; one scaler to be furnished by you and one by me.

"Yours very truly,                                   E. V. Dunlevie, per M. B.
"Dict. E. V. D."

"Office of W. D. Johnson, Manufacturer and Wholesale Dealer in Hemlock and Hardwood Lumber and Shingles—General Merchandise.

"Direct all correspondence to
"Emporium, Pa., May 13th, 1902.

"E. V. Dunlevie, Esq.—Dear Sir: I have your favor of the 10th inst., and note contents. I wish to call your attention to the fact that the proposition does not specify any amount of logs to be furnished, but only covers such as we find it expedient to bring to the river, within the time specified. I call your attention to this fact because in my opinion the amount of logs that will come to the river will be much less than stated in your letter. I also understand that the logs now at the river are to be scaled and settled for soon.

"Very truly,                                   J. W. Spangenberg, Trustee."

"E. V. Dunlevie, Manufacturer and Wholesaler. Hemlock and Hardwood Lumber, Lath and Shingles.

"Mills & Yards, Ellisburg, Pa.

"Prudential Bldg., Buffalo, N. Y., 5, 14, '02.

"Mr. J. W. Spangenberg, Trustee, Emporium, Pa.—Dear Sir: I beg to acknowledge receipt of your favor of the 13th, and note carefully what you say in regard to the amount of logs. The reason I stipulated the amount of about five million, was that, that is the amount Mr. Droney stated to me there would be, and he also added it to the letter that you wrote me, over his signature, that the same would be about five million.

"Yours very truly,                                   E. V. Dunlevie.
"Dict. E. V. D. Copy."

"Office of W. D. Johnson, Manufacturer and Wholesale Dealer in Hemlock and Hardwood Lumber and Shingles—General Merchandise.

"Direct all correspondence to
"Emporium, Pa., May 16, 1902.

"E. V. Dunlevie, Prudential Bldg., Buffalo, N. Y.—Dear Sir: Replying to yours of the 14th in regard to the amount of logs estimated to be cut and delivered to the river for you would say, that if Mr. Droney advised you that there would be five million, he was certainly mistaken. It was estimated that there would be this amount when we first talked to you, but upon later investigation the amount has been materially cut down. Just how much there is, it is impossible to say, but the writer will look the ground over very carefully and advise you later. At present there is about 700,000 cut and skidded along the river. We expect to peel all the bark and cut all the timber this year that will be available for your purpose.

"Yours truly,                                   J. W. Spangenberg,
                                                  "J. R. Droney, Trustees."

On June 16, 1902, the defendants wrote the plaintiff as follows:

"Emporium, Pa., June 16th, 1902.

"E. V. Dunlevie, Esq.—Dear Sir: We would like to realize on the logs which we have stocked at the river for you. Please let us know when you can have your man help scale them, and oblige,

"Respectfully,                                   J. W. Spangenberg,
                                                  "J. R. Droney, Trustees.
                                                  "J. W. Spangenburg."

To which the plaintiff replied as follows:

"June 21, 1902.

"Mr. J. W. Spangenberg, Emporium, Pa. Dear Sir: I beg to acknowledge receipt of your letter of the 16th, received on my return home to-day. I note what you say in reference to the matter of logs. Replying would say, I will arrange with you when I come to Emporium next week for immediate scaling of same.      Yours very truly,                              E. V. Dunlevie."

Scalers to measure the logs at the river were named, and subsequently made their report, and on November 17, 1902, the defendants wrote the plaintiff a letter inclosing an invoice or bill for the logs, which letter is as follows:

· "J. W. Spangenberg,
"J. R. Droney, Trustees.

"Office of W. D. Johnson, Manufacturer and Wholesale Dealer in Hemlock
    and Hardwood Lumber and Shingles—General Merchandise.

"Direct all correspondence to
                                    "Emporium, Pa., Nov. 17th, 1902.

"E. V. Dunlevie—Dear Sir: Enclosed please find invoice for logs sold you about May 13th now long past due. Kindly send your check for same at once to Emporium office by return mail. If you do not want these logs at the scale we have another party ready to take them at this measurement and we must know your decision at once. In case we do not receive your check by the 25th inst. we shall feel at liberty to dispose of the logs as we see fit. We will have about 150 thousand logs not in this lot for delivery about the first of next month.      Yours respct,                              J. W. Spangenberg,
                                           "J. R. Droney, Trustees."

The plaintiff at once objected to the amount demanded and wrote the defendants as follows:

"E. V. Dunlevie, Manufacturer and Wholesaler, Hemlock and Hardwood
            Lumber, Lath and Shingles.

"Mills and Yards, Cameron, Pa.

                                    "Cameron, Pa., Nov. 22, 1902.

"J. R. Droney, Trustee, Olean, N. Y.—My dear John: I am in receipt of a letter to-day from Spangenberg which seems a little absurd to me and rather uncalled for. Perhaps you have a copy of it. The purport is that he requests check at once to Emporium, Pa., stating that if we do not want the logs scaled he has another party who wants to take them and unless he receives check by 25th inst., he will be able to dispose of same elsewhere. Now, in the first place, I put my man on with your man to scale these logs. The bill Spangenberg now sends in does not agree at all with the scale as made at the time, and it is the first bill that I received of the logs the same being dated Nov. 17th. He does not seem to realize that these logs and a great many more are already sold to me under contract. Now, I am prepared to take the logs and pay for them at any moment but this kind of dealing or stand as taken by him is hardly the right spirit to start in with at the beginning of our contract. The logs were tallied by Frank Johnson who I think is now with you at Unamus. I would like very much to see you and go into this matter fully if you will kindly let me know when you will be at home at Olean.
"Very truly yours,                              E. V. Dunlevie."

Some further correspondence and negotiations followed, which will be referred to later in this opinion, and finally the plaintiff offered, through his agent, to pay for the logs at the measurement stated in the invoice, but the defendants refused to sell, and subsequently sold the logs to other parties. Some of the standing timber was cut and hauled to the river. Other logs were cut and never brought to the

river, but worked up in mills erected for that purpose. The plaintiff contends he is entitled to recover his damages not only for the logs brought to the river, but also for all the logs cut or standing on the Johnson tract, so called, amounting in all to some 5,000,000 feet of lumber. The defendants contend they are not liable at all, for reasons we shall discuss as we progress in our opinion.

It appears, however, that the plaintiff, in the first instance, assigned his claim to the Cameron Lumber Company, which brought an action of the same nature as this against the defendants in the United States Circuit Court for the Western District of New York. The action proceeded to trial, and the Circuit Court dismissed the plaintiff's complaint on the ground of a failure of the plaintiff to establish a cause of action. The plaintiff thereupon appealed to the United States Circuit Court of Appeals, from the judgment of the court below. The appeal was brought on for argument before that court, and the Circuit Court of Appeals dismissed the action, holding the United States courts had no jurisdiction to entertain the action. Both parties were, therefore, by this holding, out of court, whereupon, the Cameron Lumber Company having reassigned the claim to the plaintiff, he began this action in this court, obtaining, however, service of process only upon the defendant John R. Droney.

It is claimed by the defendant at the outset, that the action brought by the plaintiff in the United States Circuit Court, and the proceedings had in that forum, are tantamount to a common-law arbitration, and preclude the plaintiff from maintaining this action in this court. The defendant cites, in support of this contention, the cases of Diedrick v. Richley, 2 Hill, 271, and Matter of Langslow, 167 N. Y. 314, 60 N. E. 590. It may be that the plaintiff, having elected to bring an action upon his claim in the United States Circuit Court, could not be heard to raise the objection in that court that that forum had no jurisdiction to entertain the action. It is unnecessary to pass upon that question. Having, however, brought such an action in the Circuit Court, the plaintiff was entitled to all the rights and remedies and processes afforded by the United States courts, including the right to have the proceedings of the trial court reviewed by the United States Circuit Court of Appeals. The trial court having dismissed the complaint, the plaintiff availed himself of this right of review, and carried the case to the United States Circuit Court of Appeals. Upon the argument of the appeal in that court, the Circuit Court of Appeals, of its own motion, and without suggestion from the plaintiff, dismissed the entire action, upon the ground that the United States court never had any jurisdiction whatever to entertain the suit. The situation thus presented, in our opinion, is not unlike one where both parties had agreed to arbitrate their differences, and had selected their arbitrator, but where the arbitrator had refused to act and pass on their respective claims. The parties were, therefore, left just where they were before the action in the United States court was begun; with all their rights unimpaired, and the plaintiff at liberty to begin an action anew in a forum which had power and right to adjudicate on the claims of the respective parties. Mich. Ave. M. E. Church v. Hearson, 41 Ill. App. 89. The situation is clearly distinguishable from

those presented in the cases of Diedrick v. Richley, 2 Hill, 271, and Matter of Langslow, 167 N. Y. 314, 60 N. E. 590, where the chosen forum retained jurisdiction of the subject-matter. For these reasons, we think the contention that the proceedings in the United States court are a bar to a further action in this court is not well taken.

It is further strenuously urged, on the part of the defendants, that the correspondence between the parties did not create a valid or binding contract, because their minds never met, and the proposition made by the defendants was never, in fact, accepted by the plaintiff. It is argued that the reply sent by the plaintiff to the defendants' proposition contained in their letter of May 7, 1902, was not an unconditional acceptance of the offer as made, but imposed additional terms and conditions; that an acceptance to be binding must be an unconditional acceptance, without modification. I think we may assume, for the purposes of this case, that the plaintiff's letter of May 10th, although in terms accepting the offer made, did add some further provisions and conditions, not contained in the defendants' original proposition. What was, in fact, added seems to have been in conformity with the agreement reached by the parties in talks had prior to the writing of the defendants' letter of May 7th. Of course, the court cannot take judicial cognizance of their prior conversations, but must deem that all prior talks or agreements were merged in the written contract. Assuming, therefore, that this letter of the plaintiff of May 10th, in fact was not an absolute acceptance ·of the offer of May 7th, and did, in fact, make modifications thereof, nevertheless, the defendants, by their letter of May 13, 1902, in substance assented to the modification (if any) contained in the plaintiff's letter, simply calling the plaintiff's attention to the fact that the proposition of May 7th did "not specify any amount of logs to be furnished, but only such as we find it expedient to bring to the river within the time specified." In this statement, the defendants were absolutely correct. The plaintiff, on May 14, 1902, acknowledged the last letter, saying the reason he "stipulated the amount of about five million, was that, that is the amount Mr. Droney stated to me he thought there would be." It will be noticed that Mr. Dunlevie' does not in any way contradict or repudiate the agreement as stated by Mr. Spangenberg, the writer of the prior letter. On the contrary, by necessary implication, he assents to the terms and conditions as stated by said writer. On May 16th, 1902, however, the defendants wrote further saying that "if Mr. Droney advised you there would be five million, he was certainly mistaken," that while it was estimated at first there would be that amount, "upon later investigation the amount has been materially cut down." He adds that "at present there is about 700,000 cut and skidded along the river."

If I read this correspondence aright, these letters made a complete written contract between the parties. No detail or essential element was wanting. All parties regarded and treated it as a binding and valid contract, and took the prescribed steps to carry out the terms and provisions. On June 16th, the defendants wrote the plaintiff saying they wished to "realize on the logs stocked at the river for you," and asking the plaintiff to appoint his man to help scale the logs in accordance with the contract. On June 21, 1902, the plaintiff wrote promising to arrange

"for immediate scaling of the same." There was no question then in the minds of any of the parties but that the terms had been fully agreed upon, and that there was an existing contract. Men were named by the parties in accordance with the written agreement, and the logs were scaled, and later, on November 17, 1902, the defendants rendered a bill at the price per thousand agreed upon, and demanded payment "for logs sold you about May 13th," and further saying, "We will have about 150 thousand logs not in this lot for delivery about the first of next month." Dunlevie, on November 22d, replied, taking exception to the amount of the bill, but refers to "our contract." Further correspondence and negotiations followed in reference to the correctness of the scale, but in all their conversations and correspondence there was not a suggestion that a contract had not been, in fact, made, and was binding on the parties. In determining the question whether a contract has been established, the court should consider the entire correspondence, and not rest by reading a part thereof. Gates v. Dudgeon, 72 App. Div. 562, 76 N. Y. Supp. 561; Barrow Steamship Co. v. Mexican Central Railway Co., 134 N. Y. 15, 31 N. E. 261, 17 L. R. A. 359. When we read the letters passing between the parties and consider them in their entirety, we entertain no doubt but that an agreement was fully established. It is true, differences subsequently arose between them as to the true and proper interpretation of the provisions of the agreement, but such differences in no way militate against the proposition that a contract was in fact made. The contract was there, and if differences arose as to its meaning or interpretation, then it only remained for the courts to construe the contract in the light of its express terms. Sometimes contracts when made are so indefinite and uncertain that the courts will declare them void by reason of their indefiniteness, but that the contract was in fact made in this case the court entertains no doubt. Our reading of the contract, moreover, leads us to the conclusion that there exists no such uncertainty or indefiniteness in terms or provisions as would justify the court in holding it void and unenforceable for such reasons.

The contract provided for ascertaining quantities by a scaling of the logs. The contract is silent as to what scale should be adopted in measuring the logs, and it appears that there in fact exist different rules for measuring, one of which is called the "Doyle" rule, and another the "Scribner" rule. The quantity of lumber varies somewhat according as to whether the computation is made according to the Doyle or the Scribner rule. In this lot, the number of feet of lumber would be less if computed according to the Doyle rule than if the computation were made according to the Scribner rule. The plaintiff, when the scaling was finished, took the position that the computation should be according to the Doyle rule; the defendants insisted on the Scribner rule. We do not think the difference vitiates the contract, but that the court will presume that the quantity of lumber in the logs should be ascertained by the rule in common use at the place where the logs were sold and the scaling done. This we find to be the Scribner rule. Our views as above expressed are confirmed by abundant authority. In the absence of any agreed standard of measure in a contract, that of the place where a commodity is pur-

chased will govern the contract. American & English Encyclopedia of Law, vol. 30, p. 463, citing Richardson v. Cornforth, 118 Fed. 325, 55 C. C. A. 341; American & English Encyclopedia of Law, vol. 19, p. 546, citing Heald v. Cooper, 8 Me. 32; Beach on the Modern Law of Contracts, § 758, and the cases there cited; Walls v. Bailey, 49 N. Y. 464, 10 Am. Rep. 407. Having, therefore, disposed of this branch of the case, and held a valid contract existed, it remains for the court to construe and interpret the contract as made. Having found a valid contract to have been made, the next important question presented for the decision of the court in this case is the proper construction of the contract made by the parties.

It is contended by the plaintiff that the defendants sold and agreed to sell all the available timber standing upon the so-called Johnson tract, amounting in all to about 5,000,000 feet. It is argued with force that it was contemplated by the parties that this timber was to be cut and delivered at the river. The evidence seems to confirm the view that at the time the contract was made the defendants did contemplate cutting and skidding all the available timber on the tract to the river. Nevertheless, when we scrutinize the correspondence between the parties which evidences the contract between them, we are unable to discover that the defendants obligated themselves to cut and deliver at the river a stick of the standing timber. The very first proposition made to the plaintiff, under date of May 7, 1902, was to sell the logs already stocked at the Sinnemahoning river, and to sell "those which we bring to the river the coming winter." There is nothing in this letter by which the defendants agreed to deliver any quantity of logs at the river. The offer simply covered such logs as they, in fact, brought to the river. In the reply to this letter, the plaintiff says:

"My understanding of the matter being, that you sell me about five million (5,000,000) feet of hemlock, pine, and oak logs. That you are to stock the same on the banks of the Sinnemahoning river."

This last letter, in so far as it contemplated the delivery of about 5,000,000 feet of logs at the river, imposed, if accepted, a new and additional condition not embodied in the defendants' letter of May 7th. If the defendants had accepted these new conditions imposed, then the contract in question would have obligated them to have delivered about 5,000,000 feet of logs, if the tract would have yielded that quantity. But they did not accept the conditions, but replied in their letter of May 13th to the plaintiff:

"I wish to call your attention to the fact that the proposition does not specify any amount of logs to be furnished, but only covers such as we find it expedient to bring to the river within the time specified."

Some further letters followed, but there is nothing in the case which varies the defendants' written proposition limiting their agreement to sell such timber as they found "it expedient to bring to the river."

The plaintiff, if he insists a contract was made, can insist on no more than the defendants offered to sell. Clearly, under the propositions made, the defendants had a right to erect a mill on the tract, and convert a part or the whole of the timber cut into shingles or other

lumber, without bringing the logs at all to the river. This was a right they reserved, and it is no answer to that construction of the agreement to say that at the time the contract was made they anticipated drawing all the logs from the tract to the river. So long as they reserved to themselves the right to change their minds as to what was "expedient," they had the right to do so. The court can only hold the defendants to the contract they actually made, and not make one for the parties. We therefore construe the contract as not a present sale of the standing timber, but an agreement to sell such logs when cut, as the defendants should deem expedient to bring to the Sinnemahoning river. This view of the contract therefore eliminates from the case any question as to the contract being one for an interest in land, or for timber growing on land. The contract resolves itself simply into an agreement to sell purely personal property in the shape of logs, in case the defendant should cut such logs and haul them to a given point. It is contended by the defendants that the contract is void because it violates page 113 of the Laws of 1895 of the State of Pennsylvania, which provides as follows:

"1. It shall be lawful for the owner or owners of land, timber or bark, or for any person or persons having an interest therein, to grant, bargain and sell, or contract to sell, by deed, conveyance or contract in writing, signed by the grantor or grantors therein, and proved or acknowledged by them, as now required by law of this commonwealth for the signing and acknowledging of deeds, all or any right, title, claim or interest such grantor or grantors may have in or to any standing or growing timber, or the bark thereon, upon any lands in this commonwealth; and any such deed, conveyance or contract shall be taken and deemed as a deed, conveyance or contract conveying and vesting an interest in land."

It may well be that if the contract was for the sale and purchase of the standing timber on the so-called Johnson tract, the agreement established by the correspondence would be invalid under the act in question, the instrument of sale not having been proved or acknowledged as required by the act in question. But we do not regard the contract as a sale of any specific timber or any interest in land, but simply an executory agreement to sell any timber which the defendants might cut from the land and convert into personalty, and thereafter during the season of 1903 bring to the river. Strong, Deemer & Co. v. Dinning, 175 Pa. 586, 34 Atl. 919. We do not therefore deem it necessary in the disposition of this case to construe the act above quoted. We think it has no application to the case in hand.

It is contended on the part of the defense that, inasmuch as the plaintiff failed to pay or make tender of the amount actually due for the logs cut and lying at the Sinnemahoning river, he thereby made such a default in the fulfillment of the contract on his part as justified the defendants in rescinding the contract and ignoring the plaintiff. It appears that by the agreement of the parties "the logs now at the river are to be scaled and settled for soon." This provision was contained in the letter of Spangenberg to the plaintiff, dated May 13, 1902, and must be deemed to have been assented to by the plaintiff. It, however, further appears that these logs were "to be scaled by two competent log scalers, one to be furnished by you and one by me." (See plaintiff's letter to the defendants of May 10, 1902.) The amount

to be paid for these logs therefore called for the joint action of both parties. The scale, however, was not actually begun until the following August; and if the defendants had the right to have the scale made prior to that time they waived the right when they authorized their scaler to act with the one selected by the plaintiff. The scaling was not completed until September 23, 1902. It required further computation after the scaling had been done to arrive at the actual amount to be paid for the logs. Probably this computation was just as much the duty of the defendants to make as the plaintiff. However that may be, it appears that the first statement of the amount claimed to be due by the defendants was made on or about the 17th day of November, 1902, when the defendants wrote a letter to the plaintiff inclosing an invoice for the logs "sold you about May 13th." The invoice called for "427,595 ft. of logs on bank of river before May 1st, at 6.00, $2565.57." In the letter sending the invoice, the defendants say:

"If you do not want these logs at the scale, we have another party ready to take them at this measurement, and we must know your decision at once. In case we do not receive your check by the 25th inst., we shall feel at liberty to dispose of the logs as we see fit."

It will be noted that there was no rescission of the contract by the defendants in this letter, but simply a threatened rescission in case the plaintiff was unwilling to take and pay for the logs "at this measurement." It appears practically undisputed that the logs actually scaled no such quantity or measurement. There was an honest dispute as to whether the "Scribner" or the "Doyle" rule for scaling or measuring logs applied in this case. If the Doyle rule applied, the quantity was much less than if measured or figured by the Scribner rule. But, even if measured by the Scribner rule, there was but about 385,000 feet of logs at the river, and the defendants were overcharging the plaintiff in their invoice some $269.55. The plaintiff at once protested, and wrote to the defendant Droney on November 22d, saying:

"The bill Spangenberg now sends in does not agree at all with the scale made at the time, and it is the first bill that I have received of the logs, the same being dated Nov. 17. * * * I would like very much to see you and go into this matter fully if you will kindly let me know when you will be at home at Olean."

Droney replied November 24th that he would meet the plaintiff "any day this week." The plaintiff made several efforts to see Droney, but failed to find him, and in his letter to Droney of January 8, 1903, stated:

"Jan. 8, 1903.   (Buffalo General Hospital.)

"J. R. Droney, Esq., Trustee.   Olean. N. Y.—Dear Sir: I was very much surprised indeed to receive a letter from Mr. Pomeroy some days ago to the effect that you were demanding a settlement for the Johnson logs on the Scribner rule. I, however, on account of my illness and being unable for a few days to give it my attention, advised him to settle for the logs that have been scaled on the Scribner rule intending to see you and go into the matter fully as soon as I am about. I have since been advised by him, however, that you stated to him that you have decided to keep the logs. * * * I have called at your office a number of times to take the matter up with you, both at Emporium and Olean and have not been able to find you. The last time I talked with you about the matter on the train, you stated that we would get together at a con-

venient time and adjust the matter as far as the feature of the scale was concerned, which I trust we will both be able to do. I hope you will appreciate my position in the matter, and I must insist that the agreement be carried out on your part as fully as our understanding and contract provides. * * * "

These statements are not denied. While this matter was left open for purposes of adjustment, Mr. Dunlevie was, on December 24, 1902, taken to the hospital and operated on for appendicitis, and while he was in the hospital, and on December 31st, the defendants' superintendent, Cloyes, made another written demand for payment, as follows:

"Mr. Spangenberg did not arrive last night or this morning, but expect him to-day. Must insist on payment at once for logs. [Signed] J. W. Spangenberg, J. R. Droney, Trustees. Cloyes."

This was the second demand. This demand was made on Mr. Dunlevie's representative who communicated the same to him in the hospital, and he at once, on December 31st, wired his representative as follows:

"Advise Droney will take his scale this lot. Expect you here tomorrow."

With this authorization Mr. Pomeroy, the plaintiff's representative, went to Emporium, found Mr. Droney and Mr. Cloyes, and took up the matter with them, and told them he would pay for the logs by draft on a Mr. Lippincott, and showed them a telegram that he (Lippincott) would protect draft. The difference in the scale was taken up, and Pomeroy finally told them he would take the logs at their scale of 427,000; but Mr. Droney replied:

"Well, I guess you better tell Ernest (meaning plaintiff) we have decided not to sell the logs. We will put in a mill and manufacture them ourselves."

On being informed of this action, the plaintiff wrote the defendants as stated in the letter last above quoted.

These are substantially the undisputed facts, so far as the matter of payment or tender of payment is concerned. It is undisputed that the money was not paid in cash, nor tendered by the plaintiff in currency. Did that fact justify the defendants in rescinding the contract? Or, under the circumstances, did the conduct of the defendants relieve the plaintiff of the duty of making payment or tender? We have this situation: That while the contract in question was still in force and unrescinded the defendants demanded payment for the logs at the river considerably in excess of the amount they were legally entitled to receive, and accompanied their demand, with the statement that if the payment was not made in accordance with the excessive measurement the defendants would "feel at liberty to dispose of the logs," as they afterwards did. A party is sometimes held to have waived a tender or payment when due, when he has "placed himself in such a position as would make a tender to him an idle and unnecessary ceremony." Am. & E. Ency. Law, vol. 28, p. 6; citing Jewett v. Earle, 53 N. Y. Super. Ct. 349. A tender is waived by the refusal of the creditor to receive less than an amount which is larger than that to which he is entitled. Am. & E. Ency. Law, vol. 28, pp. 7, 8, citing the following cases: Thomas v. Evans, 10 East, 101; Finch v. Brook, 1 Scott, 70; Watson v. Pearson, 9 Jur. (N. S.) 501; Schayer v. Com-

monwealth Loan Co., 163 Mass. 322, 39 N. E. 1110; Guthman v. Kearn, 8 Neb. 502, 1 N. W. 129. The same doctrine is laid down in the cases of Allen v. Corby, 59 App. Div. 1, 69 N. Y. Supp. 7; Hoyt v. Sprague, 61 Barb. 497; Baumann v. Pinckney, 118 N. Y. 604–616, 23 N. E. 916. Perhaps a better statement of the rule would be that, instead of waiving payment, the conduct of the parties was such that they relieved the plaintiff from complying with their unjustified demands, and thereby estopped themselves from taking advantage of a failure to tender the proper amount by reason of their declaration that they would accept nothing less than their illegal demand. In Littlejohn v. Shaw, 159 N. Y. 188, 53 N. E. 810, it was said that, when a refusal to accept goods is based upon particular objections formally and deliberately stated, all other objections are deemed waived.

We are of the opinion that when the defendants demanded payment in a sum in excess of the amount they were legally entitled to receive, accompanied with notice that unless payment was made at the excessive figure they would deem themselves at liberty to cancel the contract, the plaintiff was not called upon to tender payment of the amount actually due, and the defendants are estopped from asserting the right to rescind because the plaintiff, under those circumstances, did not in time tender the amount in fact owing. The defendants had no right to insist on the payment of an unjust amount, and nothing else, and then put the defendant in default for not paying the true sum owing. The evidence shows that the plaintiff at last even acceded to the payment of the unjust demand rather than have his contract canceled, but even that was declined. We therefore hold that, under the circumstances, the defense of a failure to pay at the time stipulated must fail.

It is further urged by way of defense that the defendants are not personally liable for the contract claimed to have been made by them with the plaintiff; and, if liable at all, are only liable in the capacity of trustees for the creditors of Johnson, for whom they assumed to act. The essential facts as to their relationship to the property handled by the defendants are undisputed, and have been already related. The defendants were not trustees in any legal capacity. They were dealing with Johnson's property at their peril. In a certain sense, they were acting as agents for the creditors assenting to the arrangement, but the written agreement between the J. R. Droney Lumber Company, the Warren-Packard Company, Wilson Bros., and E. V. Babcock Company expressly provided there should be no "individual liability by reason thereof by any person or corporation signing the agreement." The general rule of law is that the mere use of the name "trustee," or any other name of officer or employment, will not discharge the trustee from personal liability, but the word will be deemed simply a description of the person, and the trustee will be held personally responsible. American & English Ency. of Law, vol. 28, p. 1074; U. S. Trust Co. v. Stanton, 139 N. Y. 531, 34 N. E. 1098; Taylor v. Davis, 110 U. S. 330, 4 Sup. Ct. 147, 28 L. Ed. 163; New v. Nicholl, 73 N. Y. 130, 29 Am. Rep. 111.

In addition to the reasons stated above exists the further reason that in law the defendants had no legal right to charge Johnson's property

with the payment of obligations created by them. It is said in New v. Nicholl, 73 N. Y. 130, 29 Am. Rep. 111, that:

"The general rule undoubtedly is that a trustee cannot charge the trust estate by his executory contracts unless authorized so to do by the terms of the instrument creating the trust. Upon such contracts he is personally liable, and the remedy is against him personally."

It is true certain creditors of Johnson consented to the defendants taking possession of his property and managing his affairs for their benefit; but Johnson never authorized what was done; and no court in the exercise of its judicial powers authorized it. The assent of Johnson's creditors to the course pursued did not make the defendants' action binding on Johnson, the owner of the property seized. Johnson could have appeared at any time and been entitled to assert his title against the defendants. Had he done so, there would have remained no estate out of which the obligations created by the defendants in administering the so-called trust could have been met and paid. It follows the defendants could not legally bind any of Johnson's estate by their acts or engagements. In such cases, in the absence of special agreements limiting their liability to the estate or fund administered, the defendants become personally liable. New v. Nicholl, 73 N. Y. 131, 29 Am. Rep. 111. See, also, Thacher v. Dinsmore, 5 Mass. 299, 4 Am. Dec. 61; Forster v. Fuller, 6 Mass. 58, 4 Am. Dec. 87; Hills v. Bannister, 8 Cow. 31; Ulam v. Boyd, 87 Pa. 477; Wilmoth v. Hensel, 151 Pa. 200, 25 Atl. 86, 31 Am. St. Rep. 738; Manley v. Hickman, 1 Chest. Co. Rep. (Pa.) 557; Stone v. Hickman, 1 Chest. Co. Rep. (Pa.) 561. We therefore are of the opinion that the defendants became personally liable on the contract under consideration.

It only remains to discuss the damages which should be assessed against the defendants. We have held that the damages should be confined to such logs as were actually brought to the river. The evidence is undisputed that the total amount of such logs, including those at the river at the time the proposition of sale was made, was 1,168,275 feet; of which there were 1,002,700 feet of hemlock, 83,626 feet of pine, and 81,949 of oak. The plaintiff is entitled to recover the difference between the contract price and the value of the logs at the place of delivery.

We think the testimony fairly shows this difference to have been $4,768.12, to which sum should be added interest for six years and six months, to wit, $1,969.52, making in all the sum of $6,737.64, for which sum judgment is directed.